[This decision has been published in *Ohio Official Reports* at 96 Ohio St.3d 218.]

IN RE BONFIELD.

[Cite as *In re Bonfield,* 2002-Ohio-4182.]

*Custody—Pursuant to its authority under R.C. 2151.23(A)(2), a juvenile court*
*may determine whether a shared custody agreement between partners in*
*a same-sex relationship is in the best interests of the children.*

(No. 2001-0625—Submitted March 13, 2002—Decided August 28, 2002.)

APPEAL from the Court of Appeals for Hamilton County, Nos. C-000436 and
C-000437.

_____

MOYER, C.J.

{¶1} Appellants, Teri J. Bonfield and Shelly M. Zachritz, have lived together since 1987 as partners in a same-sex relationship. During that time, Teri has adopted two children, Joseph, born in 1993, and Jacob, born in 1995. Shelly participated equally with Teri in the decision to adopt the boys.

{¶2} Teri has also given birth to three children, a son born in 1996, and twins born in 1998, each of whom was conceived through anonymous artificial insemination. Shelly actively participated in the planning and births of the children, assisted with Teri's artificial insemination, and was present throughout Teri's doctor's visits during the pregnancies and actual births. According to Teri and Shelly, since the children's respective adoptions and births Shelly has acted as their primary caregiver and has come to be seen by them as their parent in the same way as has Teri.

{¶3} Appellants' description of their family is echoed by Dr. Leslie Swift, a licensed clinical psychologist, who testified that appellants operate jointly in caring for the children, and have created a loving and committed home. Dr. Swift identified Shelly as the children's primary caretaker, as she is responsible for the

day-to-day care of the children. Dr. Swift found that both Teri and Shelly function as parents, and that the children are bonded to each of them and "go to each for similar things and also for different needs." Finally, Dr. Swift testified that should the children be separated from Shelly, their primary caregiver, it could be devastating to them.

{¶4} Notwithstanding her role as the primary caregiver for their children, Shelly has no legally recognized rights with regard to Joseph, Jacob, Nicholas, Matthew, or Samantha. Lacking such legal rights, she does not have equal access to the children's medical or school records, and is unable to authorize medical care or obtain medical insurance coverage for the children.

{¶5} An option in some states would be for Shelly to pursue a "second parent adoption." M. Jacobs, Micah Has One Mommy and One Legal Stranger: Adjudicating Maternity for Nonlegal Lesbian Coparents (2002), 50 Buff.L.Rev. 341, 345, fn. 15. Second parent adoption is a process by which a partner in a cohabiting and nonmarital relationship may adopt his or her partner's biological or adoptive child, without requiring the parent to relinquish any parental rights. E. Zuckerman, Second Parent Adoption for Lesbian-Parental Families: Legal Recognition of the Other Mother (1986), 19 U.C.Davis L.Rev. 729, 731, fn. 8. However, because second parent adoption is not available in Ohio, Shelly cannot adopt the children. Instead, if Shelly were to adopt the children herself, the effect would be to terminate Teri's rights and responsibilities as an adoptive parent. See R.C. 3107.15(A). Therefore, because Teri wishes to retain her rights as a parent, adoption of the children by Shelly is not a viable option.

{¶6} Concerned that Shelly's lack of legally recognized rights is contrary to the children's best interests both currently and in the future, appellants filed their Petition for Allocation of Parental Rights and Responsibilities in the Common Pleas Court of Hamilton County, Juvenile Division. They sought to "confirm their commitment that they will both continue to raise the children regardless of what

happens to their relationship." In addition to concerns about Shelly's status with respect to the children in the event that Teri and Shelly separate, appellants seek to secure Shelly's legal rights to the children in the event of Teri's death. For instance, if Teri were to die, Shelly's care and physical custody of the children could be interrupted for a time or even terminated, should a relative of Teri decide to petition the court for custody.

{¶7} Adopting the recommendation of the magistrate, the juvenile court found that it did not have jurisdiction to grant the petition because Shelly is not a parent within the meaning of R.C. 3109.04. The record reveals that the trial court questioned why appellants did not apply for joint custody, since custody is a much broader term than shared parenting and "the award of joint custody does not divest any party of their [own] custody." The trial court suggested that the better approach would be a shared custody arrangement and declined to "circumvent the laws of Ohio by torturing the shared parenting agreement [law] where there is no parentage." The court stated that custody of the children in a shared custody arrangement "would not be a fiction [but] a reality, [whereas] parenting is a bit of fiction in this situation." The court then invited appellants to petition for a joint custodial arrangement, without reference to "shared parenting." The record does not indicate that appellants acted upon the advice offered by the trial court.

{¶8} Upon appeal of the trial court order denying shared parenting, the court of appeals held that pursuant to R.C. 2151.23(A)(2), the juvenile court has exclusive original jurisdiction to determine the custody of any child who is not a ward of a court. As none of the Bonfield children is a ward of a court, the court of appeals concluded that the juvenile court has jurisdiction to hear the petition. However, the court held that the juvenile court must exercise its jurisdiction in child custody matters in accordance with R.C. 3109.04. Although R.C. 3109.04 does not define "parent," the court applied the definition of "parent and child relationship" in R.C. 3111.01(A) to define "parent" in R.C. 3109.04, and concluded that a

juvenile court has no authority to award to a person who is not a biological or adoptive parent parental rights or shared parenting. Accordingly, the court of appeals affirmed the trial court's dismissal of appellants' petition.

{¶9} The cause is now before this court upon the allowance of a discretionary appeal.

{¶10} R.C. 3109.04(A)(2) provides:

{¶11} "If at least one parent files a pleading or motion in accordance with division (G) of this section and a plan for shared parenting pursuant to that division and if a plan for shared parenting is in the best interest of the children and is approved by the court in accordance with division (D)(1) of this section, the court may allocate the parental rights and responsibilities for the care of the children to both parents and issue a shared parenting order requiring the parents to share all or some of the aspects of the physical and legal care of the children in accordance with the approved plan for shared parenting."

{¶12} The specific issue is whether Shelly is a "parent" for purposes of R.C. 3109.04(A)(2).

Analysis of R.C. 3109.04(A)(2)

{¶13} R.C. 3109.04(A)(2) provides that a court may, upon determining that a proposed shared parenting plan is in the best interest of the children, allocate parental rights and responsibilities for the care of children to both "parents." "Parent" is not defined in this section.

{¶14} The legal concept of "shared parenting" is relatively new in Ohio law and refers to an agreement between parents regarding the care of their children that was previously termed "joint custody." Ohio Legislative Service Commission, Analysis of 1990 Am.Sub.S.B. No. 3, at 20. In 1990, the General Assembly adopted recommendations of the Domestic Relations Task Force established by the 116th General Assembly to change "[c]hild custody and visitation laws [to] reflect a shared parenting concept where both divorcing parties remain important to their

4

children's development."  Domestic Relations Task Force Report, 116th General Assembly, 1990, at 40.

{¶15} Am.Sub.S.B. No. 3 replaced references to "joint custody" in domestic-relations-related statutes with "shared parenting."  See, e.g., former R.C. 3109.04(D)(1)(a)(i), (E)(2)(c), and 3113.215(B)(6), 143 Ohio Laws, Part I, 116, 121, 187.  "Party," in this context, was replaced with "parent."  See former R.C. 3109.05(A)(3), 143 Ohio Laws, Part I, 128.  However, the Act did not replace all references to "custody" of a child, or "parent, legal guardian," or "custodian," leaving intact those references where the context and scope of the statutory language did not warrant change.  For example, R.C. 2151.06 was not amended, and it provides that "a child has the same residence or legal settlement as his parents, legal guardian of his person, or his custodian who stands in the relation of loco parentis."

{¶16} Appellants argue that the doctrine of in loco parentis applies to the definition of "parent" in R.C. 3109.04(A)(2), and urge the court to find that Shelly stands in loco parentis to Teri's children for purposes of that statute.  They rely on *State v. Noggle*, which held that a "person in loco parentis has assumed the same duties as a guardian or custodian, only not through a legal proceeding." *State v. Noggle* (1993), 67 Ohio St.3d 31, 33, 615 N.E.2d 1040.  However, the court's determination in *Noggle* was based on an analysis of R.C. 2907.03(A)(5), which specifically provides:

{¶17} "No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:

{¶18} "* * *

{¶19} "(5) The offender is the other person's natural or adoptive parent, or stepparent, or guardian, custodian, or person in loco parentis."

{¶20} Thus, in contrast to R.C. 3109.04(A)(2), which uses only the word "parent" in the context of a shared parenting agreement, R.C. 2907.03(A)(5)

expressly includes a person in loco parentis in defining a sexual offender. The General Assembly could have provided juvenile courts with the authority to allocate parental rights and responsibilities not only to parents, but also to guardians, custodians, and others who stand in loco parentis. That the statute refers to "parent" reflects legislative intent to exclude from the benefits of R.C. 3109.04 guardians or custodians in loco parentis.

{¶21} The court of appeals applied R.C. 3111.01(A) to 3109.04(A)(2), finding that Shelly is not a "parent" within the meaning of R.C. 3111.01(A). R.C. 3111.01(A) provides:

{¶22} "As used in sections 3111.01 to 3111.85 of the Revised Code, 'parent and child relationship' means the legal relationship that exists between a child and the child's natural or adoptive parents and upon which those sections and any other provision of the Revised Code confer or impose rights, privileges, duties, and obligations. The 'parent and child relationship' includes the mother and child relationship and the father and child relationship."

{¶23} "(B) The parent and child relationship extends equally to all children and all parents, regardless of the marital status of the parents."

{¶24} Appellants argue that by its terms R.C. 3111.01(A) applies only to "sections 3111.01 to 3111.85 of the Revised Code." Therefore, it applies only for purposes of the Parentage Act, R.C. Chapter 3111, and should not be used to define the term "parent" in R.C. 3109.04. We disagree.

{¶25} Since there is no definition of "parent" in R.C. 3109.04, it is appropriate to search related sections of the Revised Code for a definition. A plain reading of R.C. 3111.01 indicates that there are three ways a "parent and child relationship" can be established: by natural parenthood, by adoption, or by other legal means in the Revised Code that confer or impose rights, privileges, and duties upon certain individuals.

{¶26} Appellants argue that the domestic relations code contains other means by which parenthood is recognized beyond simply being a "natural or adoptive parent." They point to R.C. 3111.95(A), which accords the consenting husband of a woman inseminated through nonspousal artificial insemination the status of father of the child so conceived, even though the husband has no natural or adoptive relationship to the child. They also observe that R.C. 3111.95(B) provides that a sperm donor for a nonspousal artificial insemination "shall not be treated in law or regarded as the natural father" of any child resulting from such a procedure, despite having a biological relationship with the child.

{¶27} Accordingly, appellants argue that a "psychological" or "second" parent should be treated as a parent under R.C. 3109.04 for purposes of entering a shared parenting agreement. Appellants advocate a four-part test to determine whether a person is a "psychological" or "second" parent. Under this test, the court considers (1) whether the legal parent consents to and fosters the relationship between the "psychological" or "second" parent and the child, (2) whether the "psychological" or "second" parent has lived with the child, (3) whether the "psychological" or "second" parent performs parental functions for the child to a significant degree, and (4) whether a parent-child bond has been forged between the "second" parent and the child.

{¶28} This four-part test has been used in other states to determine whether a psychological or second parent may be awarded custody. See *V.C.* v. *M.J.B.* (2000), 163 N.J. 200, 223, 748 A.2d 539 (test provides good framework for determining psychological parenthood in cases where petitioner has lived for a substantial period of time with child); *In re Custody of H.S.H.-K.* (1995), 193 Wis.2d 649, 658, 533 N.W.2d 419 (court may determine whether visitation is appropriate where nonparent petitioner first proves petitioner's parent-like relationship with child using four-part test, and a significant triggering event

justifies state intervention in the child's relationship with biological or adoptive parent).

{¶29} Ohio has adopted a similar test in the context of a wrongful death action. R.C. 2125.02(A)(1), the statute at issue in *Lawson v. Atwood* (1989), 42 Ohio St.3d 69, 536 N.E.2d 1167, provides that "an action for wrongful death shall be brought in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent." We held that such an action could be brought by a nonparent for his own exclusive benefit only when the nonparent could prove by clear and convincing evidence that (1) the natural parents of the child have disclaimed or abandoned parental rights to the child, (2) the person claiming the status of parent has performed the obligations of parenthood for a substantial period of time, (3) the child and the alleged parent have held themselves out to be parent and child for a substantial period of time, and (4) the relationship between the child and the alleged parent has been publicly recognized. Id. at syllabus.

{¶30} The existence of such a test in a wrongful death action is not dispositive of the case at issue. A difference between *Lawson* and the case at issue is the absence of a statutory definition of "parent" in R.C. 2125.02, and the definition of "parent and child relationship" in R.C. 3111.01(A). Additionally, in *Lawson,* we emphasized that there is a significant distinction between the wrongful death action at issue and a dispute between parties competing for custody or the privileges and obligations of parenthood with respect to the child. Id., 42 Ohio St.3d at 72, 536 N.E.2d 1167. Moreover, R.C. 2125.02 is a remedial law and must be construed to compensate those who have been deprived of a relationship. Id. at 70, 536 N.E.2d 1167. In contrast, R.C. 3109.04(A)(2) focuses on the best interests of the child. Finally, in *Lawson*, prior to the child's death, the person claiming to be the child's parent had been awarded legal custody of the child. Id. at 71, 536 N.E.2d 1167.

**{¶31}** Therefore, as R.C. 3109.04 specifically uses the term "parent" and this term is defined in R.C. 3111.01, we find it inappropriate to adopt appellants' four-part test to broaden the narrow class of persons who are statutorily defined as parents for purposes of entering a shared parenting agreement.

**{¶32}** Appellants argue that a biological or adoptive parent has the fundamental constitutional right, which may not be restricted by statute, to voluntarily enter into a court-approved shared parenting plan with a "psychological" or "second" parent. The fundamental due process right to make decisions concerning the care, custody, and control of one's children has been upheld in *Troxel v. Granville* (2000), 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49. However, this right does not embrace the right to have all decisions recognized or approved in law. In other words, although Teri's decision to co-parent her children with Shelly may be protected from interference by the state, Teri is not entitled to the benefit of statutes that are clearly inapplicable to such a familial arrangement.

**{¶33}** Although we have concluded that Shelly does not qualify as a parent pursuant to R.C. 3109.04, we, like the court of appeals, "do not intend to discredit [appellants'] goal of providing a stable environment for the children's growth." We note that although appellants urged the trial court to find that "both Petitioners have equal standing to parent the minor children," their brief filed in this court contains repeated references to "custody," and concludes with a plea for the court to recognize that they are "equal custodial parents." Similarly, although their petition to the trial court is ostensibly for the allocation of parental rights and responsibilities of minor children, the petition clearly states that appellants request that the court award them "the legal status of co-custodians [of] the children." Accordingly, we have examined their claim for shared parenting in the custody context and conclude that the juvenile court has jurisdiction to determine whether a petition for shared custody is appropriate.

**{¶34}** R.C. 2151.23(A)(2) provides:

**{¶35}** "(A) The juvenile court has exclusive original jurisdiction under the Revised Code as follows:

**{¶36}** "* * *

**{¶37}** "(2) Subject to division (V) of section 2301.03 of the Revised Code, to determine the custody of any child not a ward of another court of this state."

**{¶38}** The court of appeals held that the juvenile court has exclusive original jurisdiction to determine the custody of the Bonfield children under R.C. 2151.23(A)(2), but that the court must exercise this jurisdiction in accordance with R.C. 3109.04. R.C. 2151.23(F)(1). The court concluded that R.C. 3109.04 limits the juvenile court's jurisdiction in allocating parental rights and responsibilities to "parents," and that Shelly is not a parent.

**{¶39}** The juvenile court has jurisdiction to determine the custody of any child not a ward of another court, even though the court has not first found the child to be delinquent, neglected, or dependent. *In re Torok* (1954), 161 Ohio St. 585, 53 O.O. 433, 120 N.E.2d 307, paragraphs one and two of the syllabus. This exclusive responsibility "to determine the custody of any child not a ward of another court" of this state cannot be avoided merely because the petitioner is not a "parent" under R.C. 3109.04.

**{¶40}** It is well settled under Ohio law that a juvenile court may adjudicate custodial claims brought by the persons considered nonparents at law. For example, *In re Perales* (1977), 52 Ohio St.2d 89, 6 O.O.3d 293, 369 N.E.2d 1047, concerned a child whose biological mother had placed her from infancy in the care of a nonparent. The child lived with the nonparent for two years. In the ensuing custody dispute between the parent and the nonparent, *Perales* relied on R.C. 2151.23(A)(2) rather than R.C. 3109.04, since the child at issue was not a ward of another court.

10

**{¶41}** In contrast, this court has held that in a case where custody of children had already been determined by a domestic relations court in a divorce decree, and where the children are later determined to be abused, neglected, or dependent, the juvenile court has jurisdiction under R.C. 2151.23(A)(2) to make a custody determination, but must do so in accordance with R.C. 3109.04. *In re Poling* (1992), 64 Ohio St.3d 211, 594 N.E.2d 589, paragraph two of the syllabus.[1]

**{¶42}** However, the court in *Poling* limited its holding to cases where the juvenile court has obtained jurisdiction over a child under R.C. 2151.353 on the basis that the child is abused, neglected, or dependent. The court did not consider whether all custody cases arising under R.C. 2151.23(A)(2) must be decided under R.C. 3109.04, nor could such an interpretation of *Poling* be reconciled with Ohio's long-standing precedent that a juvenile court has jurisdiction to determine custody claims brought by nonparents. Therefore, we distinguish *Poling* and hold that the juvenile court has jurisdiction to determine the custody of the Bonfield children pursuant to R.C. 2151.23(A)(2) without reference to R.C. 3109.04.

**{¶43}** We next elucidate the standard the juvenile court should use in disposing of appellants' petition. In *Perales*, we found that in the custody dispute between a parent and a nonparent, the juvenile court may not award custody to the nonparent without first making a finding of parental unsuitability. *In re Perales*, 52 Ohio St.2d 89, 6 O.O.3d 293, 369 N.E.2d 1047, syllabus. This is because custody proceedings between a parent and a nonparent, unlike those between two parents, pose the possibility of terminating a parent's rights in favor of one who is not a parent. Id. at 96, 6 O.O.3d 293, 369 N.E.2d 1047.

**{¶44}** However, *Perales* involved an actual dispute between parties competing for custody. This is not the case here. In fact, appellants' petition was

---

1. **{¶a}** R.C. 2151.23(F)(1) provides:
   **{¶b}** "The juvenile court shall exercise its jurisdiction in child custody matters in accordance with sections 3109.04, 3109.21 to 3109.36, and 5103.20 to 5103.28 of the Revised Code."

unopposed at the trial level and remains unopposed. In the petition, Teri voluntarily seeks to relinquish her right to sole custody of the children in favor of shared custodial rights with Shelly.

**{¶45}** Parents may waive their right to custody of their children and are bound by an agreement to do so. *Masitto v. Masitto* (1986), 22 Ohio St.3d 63, 65, 22 OBR 81, 488 N.E.2d 857. The parents' agreement to grant custody to a third party is enforceable subject only to a judicial determination that the custodian is a proper person to assume the care, training, and education of the child. Id. at 65-66, 22 OBR 81, 488 N.E.2d 857.

**{¶46}** Upon remand the trial court shall exercise its discretion in giving due consideration to all known factors in determining what is in the best interest of the children. *In re Adoption of Charles B.* (1990), 50 Ohio St.3d 88, 552 N.E.2d 884, paragraph three of the syllabus.

**{¶47}** For the foregoing reasons, we hold that pursuant to its authority under R.C. 2151.23(A)(2), the juvenile court may determine whether a shared custody agreement between Teri and Shelly is in the best interests of the children. Accordingly, we affirm the judgment of the court of appeals in part and reverse it in part, and remand to the juvenile court for proceedings consistent with this opinion.

Judgment reversed in part,

affirmed in part

and cause remanded.

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

PFEIFER, J., concurs separately.

COOK and LUNDBERG STRATTON, JJ., concur in part and dissent in part.

_____

**PFEIFER, J., concurring.**

{¶48} Terms of art change. What used to be known as joint custody is now known as shared parenting. Whatever the label, custody is still at the heart of what Teri Bonfield and Shelley Zachritz want the court to recognize and what they want to see endure. With an award of custody comes an acceptance of the responsibility for the care and direct supervision of children. Custody connotes more than a bond, it connotes presence.

{¶49} The General Assembly's shift in terminology from joint custody to shared parenting was never meant to make custody of children exclusive to what are considered traditional parents. As the majority points out, R.C. 2151.23(A)(2) sees to that. Ohio's custody laws allow for the legal recognition of an adult's commitment to a child, and that adult's right and responsibility to continue that commitment. What we call that adult is not important. What her children call her is.

_____

**COOK, J., concurring in part and dissenting in part.**

{¶50} The majority holds that "pursuant to its authority under R.C. 2151.23(A)(2), the juvenile court may determine whether a shared custody agreement between Teri and Shelly is in the best interests of the children." In deciding this, the majority states that "the juvenile court has jurisdiction to determine the custody of the Bonfield children pursuant to R.C. 2151.23(A)(2) *without reference to R.C. 3109.04*." (Emphasis added.) I cannot agree.

{¶51} As the majority correctly notes, R.C. 2151.23(A)(2) provides that the juvenile court has exclusive original jurisdiction under the Revised Code "to determine the custody of any child not a ward of another court of this state." This statutory provision merely *empowers* a juvenile court to entertain custody determination actions; it does not, however, provide the *enabling* mechanism by which such actions come before the juvenile court. Instead, R.C. 2151.23(F)(1) dictates *how* a party invokes the juvenile court's R.C. 2151.23(A)(2) jurisdiction:

{¶52} "The juvenile court shall exercise its jurisdiction in child custody matters in accordance with sections 3109.04, 3109.21 to 3109.36, and 5103.20 to 5103.28 of the Revised Code."

{¶53} Thus, it is R.C. 2151.23(F)(1), not (A)(2), that targets procedures by which a party can properly invoke the juvenile court's jurisdiction. Under the majority's reading of the statutory scheme, *anyone* could file for custody of *any* child simply by filing an "R.C. 2151.23(A)(2) motion." Yet, the Revised Code generally limits the consideration of issues of custody/parenting of children to (1) circumstances of abuse, dependency, or neglect, see, generally, R.C. Chapter 2151, and (2) circumstances surrounding changes in the legal relationship of parents, such as divorce, legal separation, or annulment, R.C. 3109.04(A). By legislative choice, there must be a statutory trigger to invoke R.C. 2151.23(A)(2) jurisdiction.

{¶54} Here, the appellants sought to invoke the juvenile court's R.C. 2151.23(A) jurisdiction by way of R.C. 3109.04. Although this statute is a proper vehicle by which a party can invoke the juvenile court's jurisdiction, the party must be a parent of a minor child from a marriage. R.C. 3109.04(A) provides that "in any proceeding pertaining to the allocation of parental rights and responsibilities for the care of a child, * * * the court shall allocate the parental rights and responsibilities for the care of the minor children *of the marriage*." (Emphasis added.) The statute then goes on to provide for ways in which the court may allocate parental rights and responsibilities. In this case, the R.C. 3109.04(A) marriage requirement forecloses reaching determinations under the remaining portions of R.C. 3109.04, such as whether Shelly is a "parent" under R.C. 3109.04(G). Because the General Assembly does not permit same-sex marriages, see R.C. 3101.01, Teri and Shelly are not married, the children are not "of the marriage," and R.C. 3109.04(A) is inapplicable. The juvenile court thus did not err in denying a grant of custody under R.C. 3109.04.

**{¶55}** Accordingly, I concur with the majority's judgment only insofar as it affirms at least in part the judgment of the court of appeals. As to the majority's reasoning and the remainder of the judgment, I respectfully dissent.

LUNDBERG STRATTON, J., concurs in the foregoing opinion.

————————————

Sallee Fry Waterman, for appellants.

Susan J. Becker, urging reversal for amici curiae, National Association of Social Workers, American Academy of Child and Adolescent Psychiatry, American Counseling Association, American Public Health Association, and Ohio Psychological Association.

Patricia M. Longue, urging reversal for amici curiae, Lambda Legal Defense and Education Fund, Inc., National Center for Lesbian Rights, and Ohio Human Rights Bar Association.

David R. Langdon; Keating, Muething & Klekamp and Joseph L. Trauth, urging affirmance for amici curiae the Honorable Thomas E. Brinkman, Jr., Larry L. Flowers, Timothy J. Grendell, Jim Jordan, Linda Reidelbach, Twyla Roman, Michelle G. Schneider, and William J. Seitz III, Members of the Ohio General Assembly.

David R. Langdon, urging affirmance for amici curiae American Family Association of Ohio, Citizens for Community Values, Equal Rights Not Special Rights, Family First, and National Legal Foundation.

————————————