Pfeifer, J.,
dissenting.
{¶ 36} Is filial love something to be dangled and then snatched away, promised and then reneged upon? Once a natural parent promises a coparenting relationship with another person and acts on that promise, she has created a relationship between the coparent and the child that has its own life. The natural parent cannot simply declare that relationship over. That is what Kelly Mullen attempts to do in this case and what the majority decision allows. Now, no court will ever determine whether it is in Lucy Mullen’s best interests to have a continuing relationship with the woman she calls “Momma,” Michele Hobbs. Because the juvenile court in this case at the very least should have gotten to the point of making that best-interests determination, I dissent.
{¶ 37} The majority decision makes important points. It reinforces the holding from In re Bonfield, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 48-50, that an agreement to share custody is an enforceable agreement subject only to a court’s review of the best interests of the child. The majority opinion also establishes that an agreement to share custody need not be written — a natural parent’s words and conduct may demonstrate an intent to share legal custody with someone who is not a biological parent — and that if a natural parent has agreed to share custody, then a court must examine what type of custody and visitation arrangement is in the best interest of the child. Thus, promises made between adults do not legally affect a child unless a judge decides that a parent’s sharing custody with a nonparent is in the child’s best interests.
{¶ 38} However, the majority rests its decision on a determination that there was reliable, credible evidence supporting the trial court’s decision that Mullen did not relinquish partial custody to Hobbs. In my view, the trial court gave improper weight to a document that did not exist and improperly ignored the documents that did exist.
{¶ 39} The factor cited by the trial court as the most crucial to its decision is Mullen’s alleged refusal to enter into a Bonfield-type written agreement with Hobbs regarding custody. This allegation was relied upon in error. By Mullen’s own testimony, the issue was not even raised between the two until Lucy was eight months old. Hobbs placed the discussion months later. Whichever is the case, Mullen had made clear long before any discussion about a Bonfield-like agreement that she considered Hobbs a coparent.
*428 {¶ 40} In 2004, the women together began the in vitro fertilization process, jointly executing a consent and agreement for cryopreservation and disposition of frozen embryos and informed consent for in vitro fertilization. Mullen signed as the female participant, and Hobbs signed as her partner. In the informed-consent document, Mullen specifically acknowledged her partner, Hobbs, as a legal parent of any children born of the insemination process. Such a statement was not necessary to allow Mullen to proceed with the in vitro procedure but is further illustration that the women understood and agreed that Hobbs would have a custodial role once the child was born. In addition, the women shared the financial responsibility of the process.
{¶ 41} Mullen became pregnant, and with Hobbs at her side, delivered a baby on July 27, 2005. The hospital created a ceremonial birth certificate that named the couple as the baby’s parents.
{¶ 42} Thus, the facts show that a coparenting relationship was established long before any talk of a Bonfield-tjpe agreement arose. The lack of a Bonfield agreement does not negate the fact that an agreement to share custody already existed before Lucy was even born. A Bonfield agreement was not necessary.
{¶ 43} The trial court also erred in concentrating on the revocability of the three documents Mullen signed that proclaimed that she considered Hobbs a “co-parent in every way.” Before the baby’s birth, Mullen, through counsel, executed a will, a health-care power of attorney, and a general durable power of attorney for her child, in which she designated Hobbs the guardian of her minor child with authority to act as Mullen’s agent to make decisions regarding the child. The power of attorney was nonspringing: it took effect immediately and did not require Mullen’s incapacitation for Hobbs to be able to make decisions for Lucy. The document included the statement “I give my said Agent every Power with respect to my child that I possess.”
{¶ 44} In each of the three documents, Mullen signed her name acknowledging the following statement: “I consider Michele Hobbs as my child’s co-parent in every way.” That statement was not a necessary part of the legal documents. Mullen’s lawyer testified, “[M]y purpose in — in including that is that I want to— without the benefit of marriage or other protections or — I—I want to protect the rights of the co-parent to be a full co-parent. I want — I always want to make that abundantly clear in the documents.” Mullen’s statement was a way to show the world that Mullen and Hobbs intended to raise Lucy together, equally. Can an agreement that another person is a coparent in every way possibly not include a right to custody?
{¶ 45} It cannot. The trial court seems to agree, and thus turns its emphasis to the fact that the documents were revocable. But the question before the court was whether Mullen agreed to share custody of her child with Hobbs, not *429 whether she eventually came to regret that decision. Whether the documents were revocable is a red herring. The true question is when they were revoked. Executed before Lucy was born, they were not revoked when Lucy was born, when she was one year old, or even when the couple sought counseling because of difficulties in the relationship. Not until the pair separated after Lucy’s second birthday did Mullen revoke the statement “I consider Michele Hobbs as my child’s co-parent in every way.” Any reliance on what Mullen did after she separated from Hobbs was error.
{¶ 46} I would conclude that the trial court’s judgment is not based upon competent, reliable evidence. Instead of being based upon the facts of what actually happened during Mullen and Hobbs’s relationship and their parenting of Lucy, the decision was based almost entirely on how Mullen felt after the termination of her relationship with Hobbs.
{¶ 47} This case is about a natural parent’s changing her mind, and the majority’s supposed “safeguard” for future cases does not sufficiently address such a prospect and completely muddies the waters regarding what steps a couple should take to establish joint custody. The majority suggests that a would-be coparent and natural parent “agree in writing as to how custody is to be shared, the manner in which it is shared, and the degree to which it may be revocable or permanent.”
{¶ 48} Couples will justifiably wonder what the majority means when it describes a writing that sets forth “how custody is to be shared [and] the manner in which it is shared.” Is it not enough to say that the natural parent is ceding partial custody to the nonparent so that the two can raise the child together equally? Is the couple to describe in a legal document how they expect the family dynamic to develop? Can they not let the circuitous path of family life determine how they together raise the child? Must they define roles? Must they establish a visitation schedule to use after an eventual break-up, before a baby is even brought home from the hospital?
{¶ 49} The majority also mentions that the couple should establish the degree of revocability or permanence of shared custody in an agreement. But the majority has already established that any agreement that is revocable is worthless to a nonparent, even if it has not been revoked.
{¶ 50} The majority’s other suggestion, that a couple “apply to a juvenile court for an order under R.C. 2151.23(A)(2) establishing the scope of the legal custody that the parent desires to share,” is like rolling the dice. The nonparent’s future relationship with the child depends on whether the juvenile judge decides to bless the relationship. If the judge does not, then the nonparent is left with nothing.
{¶ 51} This case presents an opportunity for this court to present a more workable analysis for lower courts to employ in cases of disputed custody *430 between a natural parent and a nonparent, an analysis rooted in the intent of the parties as evidenced by the nature of the familial relationship. In this and future cases, we should adapt the four-part test set forth in In re Custody of H.S.H.-K. (1995), 193 Wis.2d 649, 658, 533 N.W.2d 419, to aid trial courts in determining whether a biological parent has ceded custody to another.
{¶ 52} In Bonfield, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 31, this court considered whether to adopt the test that the Wisconsin Supreme Court enunciated in H.S.H.-K to determine whether someone who is not a biological or adoptive parent can be accorded “psychological parent” or “second parent” status. Under the H.S.H.-K. test, a petitioner seeking visitation rights must prove four elements: “(1) that the biological or adoptive parent consented to, and fostered, the petitioner’s formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child’s care, education and development, including contributing towards the child’s support, without expectation of financial compensation; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.” H.S.H.-K, 193 Wis.2d at 658, 533 N.W.2d 419.
{¶ 53} This court ultimately decided not to adopt that test in Bonfield, finding it “inappropriate to adopt [the] four-part test to broaden the narrow class of persons who are statutorily defined as parents for purposes of entering a shared parenting agreement.” Bonfield, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 34. But Bonfield was not a disputed custody case; the parties had alleged that they were coparents and sought a court’s imprimatur of that status by using the H.S.H.-K factors to confer parenthood on the nonbiological would-be parent so that the couple could enter into a shared-parenting agreement pursuant to R.C. 3109.04. This court held that the natural parent and her partner could simply submit their agreement to the juvenile court for a “best interest of the child” determination, without parental status being accorded the natural parent’s partner. Bonfield, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 50.
{¶ 54} Here, however, there is a dispute. Hobbs wants the custody that she believes Mullen ceded to her. The juvenile court must determine whether Mullen did indeed cede custody. Though admittedly not designed for the particular purpose of determining whether custody has been ceded, adapting the H.S.H.-K. test to custody cases would present a structured way to determine whether there was a meeting of the minds on an agreement to share custody and whether the agreement was acted upon. The test determines whether a parent-like relationship developed between the nonparent and the child. It requires more than a simple promise or aspiration regarding custody and limits the possibility of a *431 nonparent’s reliance upon a misconstrued sentiment in establishing a custodial relationship with the child.
{¶ 55} For instance, the first element requires consent to and cultivation of a parent-like relationship between the adult and the child by the natural parent. Words and actions are necessary to prove the first element. H.S.H.-K, 193 Wis.2d at 658, 533 N.W.2d 419. In this case, not only did Hobbs and Mullen discuss having a child together, but the couple entered the in vitro process together and paid for it together and listed both their names as parents on a hospital-generated birth certificate; Mullen signed three legal documents that referred to Hobbs as a “co-parent in every way” and encouraged Lucy to call Hobbs “Momma.”
{¶ 56} The second element — that the petitioner and child live together — again requires evidence of an intent to create a family-like environment for the child. Id. Here, for the first two years of Lucy’s life, Mullen, Hobbs, and Lucy resided in the home that the women owned together.
{¶ 57} The third element further ensures that the relationship be parental in nature by requiring that the petitioner take significant responsibility for the child’s care, education, and development. Id. Hobbs cooked for Lucy, cared for her when she was ill, and adjusted her own work schedule to transport Lucy to and from daycare. Though Mullen carried more of the childrearing role than Hobbs, Hobbs shared significant responsibility for Lucy.
{¶ 58} Finally, the fourth element requires that the relationship be significant in duration and depth. Id. It is not enough that the child and adult have bonded; the child must be bonded to the adult in a relationship that is “parental in nature.” Id. At the time Hobbs filed her complaint to gain partial custody of Lucy, she had been living with Lucy and caring for her for almost all of Lucy’s life.
{¶ 59} Adapting the H.S.H.-K. test to determine whether custody has been ceded to a nonparent from a parent would establish important benchmarks for biological parents and partners and would create less of a “know it when we see it” rubric for trial judges in addressing custody matters. It would ensure that a nonparent cannot gain custody of a child without first having a significant, parent-like relationship with that child that the natural parent allowed and encouraged. Finally, a natural parent’s decision to end her relationship with a coparent would not obviate the reality of a child’s relationship with a coparent.
{¶ 60} I would hold that Hobbs fulfills all the H.S.H.-K. elements and that this case should be remanded to the juvenile court to determine whether shared custody would be in the best interests of the child. The majority’s decision today is the last step in this saga, and sadly, the best interests of Lucy will never have *432 been considered at any level. Instead, Mullen’s self-interest will be the sole determining factor.
Newman & Meeks Co., L.P.A., and Lisa T. Meeks; and Lambda Legal Defense and Education Fund, Inc., and Christopher R. Clark, for appellant.
Dougherty, Hanneman & Snedaker, L.L.C., and Douglas B. Dougherty, for appellee Kelly Mullen.
Terry W. Tranter, for appellee Scott Liming.
Sallee M. Fry, urging reversal for amicus curiae National Center for Lesbian Rights.
Matthew J. Burkhart and Austin R. Nimocks, urging affirmance for amicus curiae Alliance Defense Fund.
Horatio G. Mihet, Rena M. Lindevaldsen, and Mathew D. Staver, urging affirmance for amicus curiae Liberty Counsel.
American Civil Liberties Union of Ohio Foundation, Inc., Carrie L. Davis, and James L. Hardiman; and American Civil Liberties Union Foundation Lesbian, Gay, Bisexual, Transgender and AIDS Project and John A. Knight, for amici curiae American Civil Liberties Union of Ohio and American Civil Liberties Union.
Porter, Wright, Morris & Arthur, L.L.P., Kathleen M. Trafford, and Daniel B. Miller, for amici curiae National Association of Social Workers and National Association of Social Workers, Ohio Chapter.
{¶ 61} Besides Hobbs and Lucy, common decency is another victim in this case. Mullen was able to use the law as a weapon because same-sex coparents lack legal rights. The law has not caught up to our culture, and this court has failed to craft a rule that addresses reality. Mullen and Hobbs employed a well-versed lawyer who represents people in their situation, and with his advice did all they could do to protect Hobbs. A maternal relationship existed between Hobbs and Lucy. Mullen taught her daughter to call another woman “Momma” and to love her as a mother. She now wishes she hadn’t, and for the majority, that’s enough. It shouldn’t be.