[Cite as *Brown v. Wyandt*, 2014-Ohio-164.]

### IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### LOGAN COUNTY

MICHAEL J. BROWN,

     PLAINTIFF-APPELLANT,             CASE NO.  8-13-08

     v.

DEBRA L. WYANDT,               O P I N I O N

     DEFENDANT-APPELLEE.


**Appeal from Logan County Family Court**
**Juvenile Division**
**Trial Court No. 11-AD-0039**

**Judgment Affirmed**

**Date of Decision:  January 21, 2014**


**APPEARANCES:**

     *Joshua M. Stolly* **for Appellant**

     *Sheila E. Minnich*  **for Appellee**

**SHAW, J.**

{¶1} Plaintiff-appellant, Michael J. Brown ("Michael"), appeals the May 16, 2013 judgment of the Logan County Family Court, Juvenile Division, finding he did not have standing to pursue a complaint for shared custody filed against defendant-appellee, Debra L. Wyandt ("Debra"), and dismissing the complaint.

{¶2} This matter is a dispute between Debra, an adoptive parent of two minor children, and Michael, a nonparent, over the custodial rights of Debra's children. Specifically, the issue before this Court is whether Debra, by her words and conduct with Michael, entered into an agreement through which she permanently relinquished sole custody of her children in favor of shared custody with Michael. *See In re Mullen*, 129 Ohio St. 3d 417, 2011-Ohio-3361, ¶ 1.

{¶3} The parties first became acquainted in 1987. In 1999, Michael hired Debra to work as an assistant in his business. Shortly thereafter, Michael and Debra became physically intimate. Both were married to other people at the time, however, Debra divorced sometime in late 1999 or early 2000. Debra eventually became Michael's business partner when Michael gave her 50% of the shares in his company.[1]

{¶4} In 2002, Michael and Debra began conducting business in Westfield, Indiana, when they purchased the property next to the home Michael shared with

---

[1] The parties' business primarily involved an insurance brokerage agency and a real estate investment company.

-2-

his wife. The office property was a residential home with a home office attached. Debra lived on the premises which also had an upstairs apartment with a separate outdoor entrance. Debra leased the upstairs apartment to tenants for a year while she lived in the lower quarters.

{¶5} With Michael's support and encouragement, Debra pursued her long-standing goal of adopting a child. In January of 2002, Debra completed an application for a single parent adoption of a child from China. In June of 2002, the adoption of her oldest daughter, Mikayla (born in June of 2001), was finalized. Debra's mother and sister accompanied her to China to retrieve Mikayla. The adoption was financed by funds obtained through the business.[2] After arriving home, Mikayla lived with Debra at her residence.

{¶6} The parties' intimate physical relationship ended in 2003, however, the two remained close friends and business partners. Debra began pursuing the adoption of a second child from China. At this point in time, China's policy regarding single parent adoptions had become more restrictive. Michael's business associate, Xin Chen, contacted the agency in China on Debra's behalf and was able to assist Debra in securing a limited opening available for a single parent adoption. In January of 2005, the adoption of Debra's youngest daughter, Katelyn (born in August of 2003) was finalized. Again, Debra travelled to China

---

[2] The parties disagree as to whether the funds used to finance the adoption were derived solely through Debra's shares or through the parties' joint shares.

with her mother and sister to retrieve Katelyn. Katelyn lived with Mikayla and Debra in Debra's home.

{¶7} Sometime later in 2005, Michael and his son, Jeremy, moved into the upstairs apartment above Debra's residence and the office. Even though Michael had unfettered access to the lower quarters and the office during the day, Debra and Michael maintained separate residences.

{¶8} In September of 2006, Michael and his wife divorced.

{¶9} Michael and Debra continued to be business partners and friends, but the parties never rekindled their physical relationship. Debra admittedly facilitated a close relationship between Michael and her daughters. Michael spent a significant amount of time with Debra and her daughters and helped Debra raise them. The girls referred to Michael as "Fubaba" as a term of endearment.[3]

{¶10} In 2007, Michael began to make increasingly frequent trips to China to explore business opportunities there. Debra maintained the daily business operations from her home in Indiana. In January of 2008, Michael moved into an apartment in Beijing and he spent a significant amount of time in China that year. Michael consistently maintained contact with Debra and the girls through phone conversations and internet video chats. Nevertheless, Debra and Michael's

---

[3] The testimony at trial indicates that "Fubaba" translates to mean "rich daddy."

relationship began to deteriorate. Michael had become involved with another woman in China, whom he eventually married in February of 2010.

{¶11} In the fall of 2008, Debra decided to cut all ties with Michael and moved to West Liberty, Ohio, where her parents reside. Michael was unaware of Debra's decision until he returned from China in September of 2008. Debra and Michael subsequently became involved in a contentious litigation in Indiana over the dissolution of their business.

{¶12} On March 15, 2011, Michael filed a complaint for shared custody pursuant to R.C. 2151.23. Michael claimed that by her words and conduct Debra had contractually relinquished sole custody of Mikayla and Katelyn and agreed to raise the children with him as a family. Michael argued that Debra's relocation to West Liberty, Ohio, while he was in China on business was a breach of their agreement. Michael sought a court order of shared custody and requested that the trial court establish a visitation schedule between him and the children.

{¶13} On March 7, 2012, Debra filed a "Motion to Bifurcate Hearing," requesting that the trial court bifurcate the issues to first determine whether Michael had standing as a nonparent to pursue the complaint for shared custody before determining whether granting Michael visitation is in the children's best interest.

{¶14} On April 7, 2012, the trial court granted Debra's motion in part, bifurcated the proceedings, and set the issue of Michael's standing to pursue shared custody for a hearing.

{¶15} On June 21 and 22, 2012, the trial court held a hearing on the matter. The most pertinent testimony regarding the issue of whether Debra contractually relinquished her rights to sole custody of her children in favor of shared custody with Michael came from the parties themselves. Each party also called friends and family as additional witnesses. However, these witnesses simply supported the version of the events testified to by the party calling them and did not provide any independent insight into the existence of a custodial agreement between Debra and Michael.

{¶16} Michael testified that in the 1990's Debra expressed her desire to have a family. Michael claimed that during the late 1990's he and Debra made long term plans to adopt a child and agreed to permanently raise the child together. Michael admitted that there was no written contract documenting their intent but claimed there was a verbal agreement between the two of them. Michael insisted that his marriage to another woman, with whom he already had children, had no effect on his commitment to adopt children with Debra. Michael explained that together he and Debra financially strategized to fund the first adoption by buying and selling real estate. He testified that the money used to finance both adoptions

came from the business proceeds which they jointly shared. Thus, Michael maintained that he funded at least half of the adoption expenses.

{¶17} Michael acknowledged that Debra completed a single parent adoption for both children and that he was not the children's adoptive parent. He admitted that he was not on the documents pertaining to the adoptions because he was still married. However, Michael testified that he encouraged Debra in achieving her goal of having a family throughout the adoption process. He recalled accompanying her to meetings with different agencies and supporting her throughout the process because he knew it was something "she really wanted" and he was "100 percent behind her." (Tr. at 94). Michael also testified that as part of the adoption applications he signed letters of reference for Debra and agreed to be designated as the children's guardian in some of the adoption paperwork should something happen to Debra.

{¶18} Michael recalled that he was present at the airport with friends and family members when Debra brought Mikayla and Katelyn home from China. He also testified that, with the help from an office assistant, he looked after Mikayla for nineteen days while Debra travelled to China with her family to retrieve Katelyn.

{¶19} Michael described himself as the children's father and claimed that his relationship as their parent was no different than Debra's. Michael testified

that he financially and emotionally supported the children. He explained that he and Debra discussed "everything you talk about when you have a child" such as their diets, education, and even the color of their rooms. He recalled making diaper runs, going out to eat together, and preparing meals for the children and Debra. Michael also recalled accompanying Debra to the children's medical appointments and claimed that they jointly made medical decisions on the children's behalves. He described spending holidays with Debra and the children and vacationing together. He maintained that he was a constant in the children's daily lives despite the fact that he and Debra maintained separate residences.

{¶20} Michael testified that Debra willingly fostered a relationship between the children and him. He presented numerous exhibits of holiday, birthday, and father's day cards that Debra purchased and had the children sign. He also testified that Debra had named him as the children's guardian in her last will and testament.

{¶21} Michael claimed that he and Debra contemplated marriage for several years. He explained that in the beginning marriage was not possible because he was married to another woman and years later, after his divorce, their relationship became increasingly strained as he travelled to China more frequently and eventually informed Debra he was a "free agent" with regard to their relationship. (Tr. at 166). Michael gave several reasons for why a marriage never

occurred, including his involvement with another woman in China, whom he eventually married, and the objections from Debra's family to their relationship. However, Michael insisted that, up until the time she moved to Ohio in 2008, Debra did not allow the stresses in their personal relationship to interfere with his ability to parent the children.

{¶22} Michael recounted that he returned to Indiana from China on September 21, 2008, to find the locks on the office had been changed and the business bank accounts had been moved. He then learned that Debra had moved the children to Ohio without his knowledge. Michael recalled that the last time he saw the children was on July 29, 2008, when he said good-bye to them at the Beijing airport following a visit to China by Debra and the children. The children were six and four-years-old at the time.[4]

{¶23} Debra described her relationship with Michael as business partners and close friends. She admitted that they were physically intimate at one time, but was adamant that between 2005 and 2008 they were strictly business partners and friends.

{¶24} Debra testified that she adopted both of her children through single parent adoptions. She explained that she and Michael did not receive regular paychecks from their business and that their company paid most of their expenses.

---

[4] The children were approximately eleven and nine-years-old at the time of the hearing.

Debra testified that the adoptions were funded through shareholder loans made to her from the corporation involved with their businesses. She acknowledged that Michael provided her encouragement throughout the adoption process. He attended some meetings with her and signed one of three letters of reference that she needed for the adoption applications. However, Debra testified that she alone compiled all the paperwork for the adoption, completed fingerprinting and a home study, and fulfilled all the other requirements for the adoptions set forth by the United States and Chinese governments.

{¶25} Debra explained that prior to adopting her oldest daughter, Mikayla, she and Michael had a conversation about how the child would refer to Michael. At the hearing Debra provided the following testimony regarding the decision to use the term "Fubaba."

> **[Michael] did not want to be called Uncle Mike. He did not want to be called Mike. And we both agreed that she couldn't call him daddy, because he wasn't her daddy. At that time we were reading through the books by Robert Kiyosaki, Rich Dad, Poor Dad books. And in one of his writings, he talked about when he—this is Kiyosaki, when he would travel to China and hand out candy to kids, they called him Fubaba. So we just kind of latched onto that and decided that would be the term of endearment that Mikayla would use for Michael, because nothing else was satisfactory.**

(Tr. at 225-26). Debra recalled that each time she went to China to retrieve her children she was accompanied by her mother and sister.

-10-

{¶26} Debra acknowledged that she helped foster a relationship between Michael and her children, but denied that she ever intended to relinquish any of her custodial rights to him. She explained that she and Michael were a team when they were working together, that they cared for one another, and they "covered each other's back side." (Tr. at 237). She recalled that she also had a relationship with Michael's three children and that she helped Michael take care of them. Specifically, she remembered assisting all three of Michael's children with filling out their FAFSAs and completing their college applications. She taught two of Michael's children how to drive and hosted a graduation party for his son who lived in the upstairs residence with Michael. She also testified that the business paid for the expenses of Michael's children as well as hers.

{¶27} Debra admitted that Michael was involved in the daily lives of her children when they operated their business out of her home in Indiana. She explained that on a typical day Michael would come down from the upstairs apartment in the morning, have breakfast with Debra and the children, and work from the home office. They would both attend to the children throughout the day; however, Debra insisted she was the children's primary caretaker.[5] Debra recalled that sometimes they had long work days and it would often be 10:00 p.m. before Michael left the office to return to his apartment.

---

[5] Testimony from other witnesses indicated that Michael and Debra had assistants working for them who also helped with attending to the children during the day and while they travelled on business trips together.

{¶28} Debra testified that the children always stayed in her home and did not sleep in the upstairs apartment with Michael. She admitted that she and Michael made health care decisions together, but also stated that Michael never took the children to doctor's appointments by himself. She recalled vacationing with Michael, and sometimes with his children, but she also testified that she and her children stayed in separate accommodations from Michael. Debra testified that she had at one time named Michael as the children's guardian in her last will and testament. However, she testified that she has since revoked that designation.

{¶29} Debra also acknowledged that she intended Michael's role in her children's lives to be permanent as long as they were together, but she was adamant that there was no contractual agreement to relinquish any of her custodial rights to Michael. She also recalled that despite his involvement in raising her children, Michael never attempted to adopt the children after his divorce in 2006.

{¶30} After hearing the evidence, the trial court issued a thirty-page judgment entry detailing its findings of fact and conclusions of law. The trial court determined that Michael had failed to prove by a preponderance of the evidence that Debra had contractually agreed to relinquish sole custody of her children in favor of shared custody with him. Accordingly, the trial court concluded that Michael did not establish that he had standing to pursue a complaint for shared custody and dismissed the action.

{¶31} Michael filed this appeal, asserting the following assignments of error.

**ASSIGNMENT OF ERROR NO. I**

**THE TRIAL COURT ERRED IN RULING [DEBRA] DID NOT CONTRACTUALLY RELINQUISH SOLE CUSTODY OF HER MINOR CHILDREN IN FAVOR OF SHARED CUSTODY WITH [MICHAEL].**

**ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN DETERMINING CONTRACTUAL RELINQUISHMENT BY CONSIDERING THAT [MICHAEL] HAD THE REMEDY OF MARRYING [DEBRA] AND ADOPTING THE MINOR CHILDREN.**

*First Assignment of Error*

{¶32} In his first assignment of error, Michael argues that the trial court erred when it determined that Debra, by her words and conduct, did not contractually relinquish sole custody of her children in favor of shared custody with him.

{¶33} The Supreme Court of Ohio has recently stated that Ohio law does not provide for a statutory "shared parenting" arrangement with a nonparent because a nonparent does not fall within the definition of "parent" under the current statutes. *In re Mullen*, 129 Ohio St.3d 417, 2011-Ohio-3361, ¶ 11, citing *In re Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, ¶ 35; R.C. 3109.04. However, a parent may voluntarily share with a nonparent the care, custody, and

control of his or her child through a valid shared custody agreement. *Mullen* at ¶ 11, citing *Bonfield* at ¶ 50; R.C. 2151.23(A)(2). "A shared-custody agreement recognizes the general principle that a parent can grant custody rights to a nonparent and will be bound by the agreement." *Mullen* at ¶ 11, citing *Bonfield* at ¶ 48. The Supreme Court has also stated that even though reducing such an agreement to writing is the best way to safeguard both a parent's and a nonparent's rights with respect to children, Ohio law does not require a parent to create a written contract and has recognized that a parent may enter into a shared custody agreement through words and conduct alone. *Mullen* at ¶¶ 14, 21; citing *Masitto v. Masitto*, 22 Ohio St.3d 63, 66 (1986) and *In re Perales*, 52 Ohio St.2d 89, syllabus (1977); *see also*, *Rowell v. Smith*, 10th Dist. Franklin No. 12AP-802, 2013-Ohio-2216.

**{¶34}** The essence of a shared custody agreement is the purposeful relinquishment of some portion of the parent's right to exclusive custody of the child. *Mullen* at ¶ 11. The determination of whether such a contract is present is essential. If there is no such contract, then the parent retains all parental rights. *Mullen* at ¶ 12. If there is such a contract, then the juvenile court must engage in a "suitability" and "best interests" analysis. *Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, at ¶ 48, 50.

{¶35} Whether a parent has voluntarily relinquished the right to custody is a factual question to be proven by a preponderance of the evidence. *Mullen*, 129 Ohio St.3d 417, 2011-Ohio-3361, ¶ 14, citing *In re Perales*, 52 Ohio St.2d 89, syllabus (1977); *Reynolds v. Goll*, 75 Ohio St.3d 121, 123 (1996). Likewise, whether a parent, through words and conduct, has agreed to share legal custody with a nonparent is also a question of fact. *Mullen* at ¶ 14. A trial court has broad discretion in proceedings involving the care and custody of children. *Id*., citing *Reynolds* at 124. The determination of whether a "parent relinquishes rights to custody is a question of fact which, once determined, will be upheld on appeal if there is some reliable, credible evidence to support the finding." *Mullen* at ¶ 15, quoting *Masitto* at 66.

{¶36} In the instant case, the trial court engaged in an extensive analysis to determine whether Debra's conduct created any agreement by which she had permanently ceded legal custody rights to Michael. After recounting the evidence adduced at the hearing, the trial court stated the following in its judgment entry.

> **This case is complicated, as the parties started their relationship as partners, evolved into an intimate relationship, which ceased to exist at or shortly after the adoption of Mikayla, while their business relationship continued forward through 2008. While there is no direct evidence, of a written agreement or written understanding, there certainly is sufficient testimony to substantiate that Michael was around Debra's children for a period of time from 2002 through July 2008. During 2007 and 2008, his contact with the children was diminished significantly by multiple trips to China. The real question however, is**

> **whether that contact and in the words of Michael, Debra's failure to interfere with him acting like a father, rise to the level of a surrender of custody. Certainly the fact and location of their business relationship, along with the fact that Mr. Brown was still married until September 2006, all make this a much more complicated picture and much harder to distinguish. Even if the court was satisfied that Debra was trying to share her children with Michael, with the encouraging cards, trips, and a showing what a family could be, there were limitations and boundaries to their relationship.**

(Doc. No. 97 at 23-24). The record reflects that the limitations and boundaries to the parties' relationship were more than just keeping separate residences and staying in separate hotel rooms when travelling.

{¶37} It is clear from both Debra's and Michael's testimony, that Debra consciously maintained distance between Michael and herself after she adopted her children. The parties never rekindled their romantic relationship after Michael's divorce, despite Michael's testimony that he was willing to do so. The parties both testified that this was due to Debra's reluctance to become physically intimate with Michael again, which eventually led Michael to become involved with another woman.

{¶38} Furthermore, even though Debra admittedly fostered a close relationship between Michael and her daughters by allowing him to be significantly involved in their upbringing, the record also reveals that Debra put limitations on Michael's role in her children's lives. Other than when Michael looked after Mikayla for nineteen days during Debra's trip to China to bring

-16-

Katelyn home, which he did with the assistance of an employee, Michael never independently parented Debra's children. Rather, all the instances cited by Michael to demonstrate that he acted as the children's "father" are ones in which he and Debra were involved with together. Thus, while it appears that Debra permitted Michael to share a substantial part of her life with the children, there is simply no evidence to substantiate Michael's claim that Debra intended to permanently relinquish her sole custodial rights to him.

{¶39} Moreover, we note that the parties disputed the nature and extent of Michael's role in the adoptions of Debra's children and the only evidence supporting Michael's contention that the parties verbally agreed to share custody of the children came from his own testimony and was not corroborated by any other witness.

{¶40} In its decision dismissing Michael's petition for shared custody, the trial court also compared the facts and circumstances of this case to the ones in *In re Mullen*, in which the Supreme Court recently evaluated whether a parent's conduct with a nonparent had established the existence of a shared custody agreement. *Mullen*, 129 Ohio St.3d 417, 2011-Ohio-3361. *Mullen* involved two women, Mullen and Hobbs, who were in a committed relationship and lived together. *Mullen* at ¶ 2. Upon Mullen expressing her desire to have a child, Hobbs found a friend willing to be the sperm donor. *Id*. Mullen began the process

of in vitro fertilization, which was jointly financed by both women. Mullen became pregnant and gave birth to a child. *Id*. at ¶ 3. Hobbs was present at the birth and the women created a ceremonial birth certificate listing the two of them as the child's parents. *Id*.

{¶41} Prior to the child's birth, Mullen executed a will in which she nominated Hobbs as the guardian of her minor child. *Mullen* at ¶ 4. Mullen also executed a healthcare power of attorney and a general durable power of attorney for her child giving Hobbs the authority, as Mullen's agent, to make decisions regarding the child. *Id*. In each of these documents, Mullen acknowledged that she was the legal parent of the child but also stated that she considered Hobbs "to be [her] child's co-parent in every way." *Id*. Mullen and Hobbs co-parented the child for two years before their relationship deteriorated and ultimately ended. *Id*. at ¶ 5.

{¶42} Hobbs filed a petition for shared custody which was initially granted by the magistrate but later rejected by the juvenile court. *Mullen*, 129 Ohio St.3d 417, 2011-Ohio-3361, ¶¶ 7-9. Specifically, the juvenile court concluded that a preponderance of the evidence did not conclusively demonstrate that Mullen's conduct created a contract that permanently gave Hobbs custodial rights to her child. *Id*. at ¶ 9. The First Appellate District upheld the juvenile court's decision and the Supreme Court affirmed the decision of the appellate court finding that

-18-

there was reliable, credible evidence to support the juvenile court's conclusion. *Id*. at ¶¶ 10, 24.

**{¶43}** After setting forth the reasoning supporting its decision, the trial court in this case stated the following it is judgment entry:

> **The Court would have been more persuaded had the presentation by [Michael] been more like a mosaic of pieces, creating a clear picture of intent, action, and result of those actions on the part of Debra. But, rather what appears to have been assembled here was a collection of bits and pieces, which appears to be more of a collage of odds and ends of actions on the part of [Michael], without interference by [Debra], which would require a significant amount of imagination to come up with the picture and solution desired by [Michael].**
>
> **\* \* \***
>
> **When using the Mullen case as a grid, to evaluate whether the actions of Debra constituted a voluntary surrender of custody of her children, this case does not have as many examples of such actions taken by the parent as those in the Mullen case.**

(Doc. No. 97 at 24, 26).

**{¶44}** After reviewing the evidence relied upon by the trial court, we concur that Michael failed to demonstrate by a preponderance of the evidence that Debra, by her conduct, agreed to permanently cede partial custody rights of her children to him. We also agree with the trial court that the evidence presented by Michael in support of his petition for shared custody falls short of the evidence presented in *Mullen*, which was also held to be insufficient to establish the existence of a shared custody agreement.

{¶45} In sum, we find the trial court's conclusion that Debra by her conduct with Michael did not create an agreement to permanently relinquish sole custody of her children in favor of shared custody with him was supported by some competent, credible, and reliable evidence. *See Mullen* at ¶ 23. Accordingly, we find no error in the trial court's decision finding Michael did not have standing to pursue a shared custody petition against Debra and we overrule Michael's first assignment of error.

### *The Second Assignment of Error*

{¶46} In his second assignment of error, Michael argues that the trial court erroneously relied upon the fact that Michael never married Debra and adopted the children as a step-parent in making its determination that a shared custody agreement did not exist between the parties.

{¶47} It is apparent when reviewing the thirty-page judgment entry of the trial court that Michael misconstrues the trial court's reasoning. While the trial court does mention the fact that Debra and Michael never married, it is clear that this is one of several factors cited by the trial court in its analysis of the evidence in the case. Absent a written shared custody agreement evidencing the parties' intent, the trial court is forced to rely on evidence of parties' conduct with each other to determine whether a shared custody agreement existed. *Mullen* instructs that when engaging in such an inquiry, the trial court must focus on whether the

*parent's conduct* with the nonparent created an agreement for permanent shared custody of the parent's child. *Mullen*, 2011-Ohio-3361, ¶ 12. It is evident from the trial court's judgment entry that in this case it complied with the directives in *Mullen* in determining that no shared custody agreement existed between the parties. Accordingly, we find no merit in Michael's contentions regarding this aspect of the trial court's decision and therefore we overrule his second assignment of error.

{¶48} For all these reasons, the judgment of the Logan County Family Court, Juvenile Division, is affirmed.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**