IN RE MULLEN; HOBBS, APPELLANT; MULLEN ET AL., APPELLEES.

[Cite as *In re Mullen,* 129 Ohio St.3d 417, 2011-Ohio-3361.]

*Shared custody — Standard of review — Competent, credible evidence supports juvenile court's holding — Judgment affirmed.*

(No. 2010-0276 — Submitted February 2, 2011 — Decided July 12, 2011.)

APPEAL from the Court of Appeals for Hamilton County, Nos. C-090285 and C-090407, 185 Ohio App.3d 457, 2009-Ohio-6934.

_____

CUPP, J.

{¶ 1} The issue raised in this case is whether a parent, by her conduct with a nonparent, entered into an agreement through which the parent permanently relinquished sole custody of the parent's child in favor of shared custody with the nonparent. For the reasons that follow, we hold that competent, credible evidence supports the juvenile court's conclusion that the parent did not enter into such an agreement. Accordingly, we affirm the judgment of the court of appeals.

**Factual Background**

{¶ 2} This matter is a dispute between a biological parent and a nonparent over the biological parent's minor child. Michele Hobbs, appellant, met Kelly Mullen, appellee, in May 2000. The two began a relationship and eventually commenced living together. In 2003, Mullen expressed a desire to have a child. Hobbs asked a friend, appellee Scott Liming, who lived in Atlanta, Georgia, to donate his sperm to Mullen for an in vitro fertilization procedure. Liming agreed. Mullen and Liming signed a purported "Donor-Recipient Agreement on Insemination," prepared by an attorney, in which Liming agreed to provide his semen to Mullen to use for purposes of her insemination. The

agreement provided that Liming would be named as the father on the birth certificate of any child conceived but that he otherwise relinquished all parental rights and waived any action for future custody of, or visitation with, any children born to Mullen from the insemination procedure. Mullen agreed not to hold Liming legally or financially responsible for any child conceived. Hobbs was not a party to the agreement.

{¶ 3} In 2004, the women began the in vitro fertilization process, in which Mullen was the recipient of the implantation. The women shared the financial responsibility of the process. Mullen became pregnant and delivered a baby on July 27, 2005. Hobbs was present at the birth. The birth certificate identified Mullen as the child's mother and Liming as the father. The birth certificate is on file in the Office of Vital Statistics at the Ohio Department of Health. The women created a ceremonial birth certificate that listed the two of them as the baby's parents. Liming also formally acknowledged paternity.

{¶ 4} Before the baby's birth, Mullen, through counsel, executed a will, in which she nominated Hobbs as the guardian of her minor child. Mullen also executed a health-care power of attorney for her child and a general durable power of attorney for her child. In each of the latter two documents, Mullen gave Hobbs the authority to act as Mullen's agent and to make decisions regarding the child. In each document, Mullen acknowledged that she was the legal parent of the child but that she considered Hobbs "to be [her] child's co-parent in every way."

{¶ 5} Shortly after the child's birth, Liming moved back to Ohio and began visiting the child. For the two years after the child's birth, the women coparented. In 2007, the women's relationship deteriorated. In October 2007, Mullen and the child moved out of the house that they had shared with Hobbs.

**Procedural Background**

**{¶ 6}** In December 2007, Hobbs filed a verified complaint for shared custody in the Hamilton County Juvenile Court pursuant to R.C. 2151.23(A)(2) and a motion for visitation during the proceedings. Hobbs alleged that Mullen had created a contract through her conduct with Hobbs to permanently share legal custody of the child. Hobbs asked the court to grant her immediate visitation rights with the child and to enter an order pursuant to R.C. 2151.23(A)(2) granting her equal and shared custody of the child. In January 2008, Liming also petitioned for shared custody of the child.

**{¶ 7}** A magistrate determined that Hobbs had actively participated in the decision and process to have a child, that Mullen and Hobbs had had an understanding that they would act as equal coparents, and that Mullen had made an agreement taking away Liming's parental rights and responsibilities while, in three other documents, naming Hobbs as an equal coparent. Thus, the magistrate concluded that Mullen's conduct had created an agreement with Hobbs in which Mullen relinquished partial custody of her child to Hobbs and that it was in the child's best interests to maintain ties with Hobbs.[1]

**{¶ 8}** Both Mullen and Liming filed objections to the magistrate's report. The juvenile court rejected the magistrate's decision. In its entry, the juvenile court focused on the legal relationship of each party to the child: Mullen was the biological and natural mother of the child and had acquired legal custody by operation of law; Liming was the legal, natural, biological father with the potential to obtain full custodial rights; Hobbs was a nonparent under Ohio law despite her active role in raising and caring for the child.

**{¶ 9}** Based on the testimony provided by Mullen, Liming, Hobbs, and others, as well as documentary evidence, the juvenile court concluded that a

---

1. The magistrate did not make a recommendation on the custody petition filed by Liming, but noted that the biological parents "apparently intend to enter into an agreement with one another on visitation or shared parenting."

preponderance of the evidence did not conclusively demonstrate that Mullen's conduct created a contract that permanently gave partial custodial rights of the child to Hobbs. The juvenile court concluded that the magistrate had incorrectly required Mullen to share custody of her child, and the court dismissed Hobbs's complaint for shared legal custody.[2]

{¶ 10} On Hobbs's appeal, the court of appeals concluded that the decision by the juvenile court judge was supported by competent, credible evidence, and it affirmed the juvenile court's decision. *In re Mullen*, 185 Ohio App.3d 457, 2009-Ohio-6934, 924 N.E.2d 448, ¶ 17. The cause is before this court upon the acceptance of a discretionary appeal. *In re Mullen*, 125 Ohio St.3d 1413, 2010-Ohio-1893, 925 N.E.2d 1001.

**Analysis**

*Parental rights*

{¶ 11} Parents have a constitutionally protected due process right to make decisions concerning the care, custody, and control of their children, and the parents' right to custody of their children is paramount to any custodial interest in the children asserted by nonparents. *Troxel v. Granville* (2000), 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49; *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169; *Clark v. Bayer* (1877), 32 Ohio St. 299, 310. A parent's right to make decisions concerning the care, custody, and control of his or her children, however, is not without limits. For example, Ohio does not recognize a parent's attempt to enter into a statutory "shared parenting" arrangement with a nonparent, same-sex partner because the nonparent does not fall within the definition of "parent" under the current statutes. *In re Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 35; R.C. 3109.04. Rather, a parent may voluntarily share with a nonparent the care, custody, and control of his or her child through a

---

2. The court also dismissed Liming's complaint for custody so that appellees might pursue shared parenting under R.C. 3109.04. That issue is not before this court.

valid shared-custody agreement. *Bonfield*, ¶ 50; R.C. 2151.23(A)(2). The essence of such an agreement is the purposeful relinquishment of some portion of the parent's right to exclusive custody of the child. A shared-custody agreement recognizes the general principle that a parent can grant custody rights to a nonparent and will be bound by the agreement. *Bonfield*, ¶ 48, citing *Masitto v. Masitto* (1986), 22 Ohio St.3d 63, 65, 22 OBR 81, 488 N.E.2d 857; see *Clark*, paragraphs two and three of the syllabus (parents' grant of custody to a nonparent through an agreement recognized as lawful and enforceable). A valid shared-custody agreement is reviewed by the juvenile court and is an enforceable contract subject only to the court's determinations that the custodian is "a proper person to assume the care, training, and education of the child" and that the shared-legal-custody arrangement is in the best interests of the child. *Bonfield* at ¶ 48, 50.[3]

{¶ 12} This appeal concerns whether a parent's conduct with a nonparent created an agreement for permanent shared legal custody of the parent's child. The determination of whether such a contract is present is essential. If there is no such contract, then the parent retains all parental rights. If there is such a contract, then the juvenile court must engage in a "suitability" and "best interests" analysis. *Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, at ¶ 48, 50.

*Evidentiary standards and standards of review*

{¶ 13} Central to answering the question of whether the parent agreed to relinquish permanent, partial legal custody of her child to a nonparent is the

---

3. This court has also examined agreements in which a parent is claimed to have contractually relinquished sole custody of his or her child to a nonparent. See *Masitto v. Masitto* (1986), 22 Ohio St.3d 63, 66, 22 OBR 81, 488 N.E.2d 857 (a father who allowed his in-laws to become guardians of his daughter, later consenting in writing, was deemed to have forfeited his rights to custody); *In re Perales* (1977), 52 Ohio St.2d 89, 96, 6 O.O.3d 293, 369 N.E.2d 1047 (a mother who agreed to give custody to a nonparent was alleged to have forfeited her custody right to nonparent). Although the circumstances presented in this appeal are different because the question involves shared legal custody, the underlying principles pertaining to contractual relinquishment of custody rights are applicable.

evidentiary standard by which the juvenile court must weigh the evidence and reach its decision. If that decision is appealed, then the standard of review that the appellate court must apply to the juvenile court's decision becomes relevant.

{¶ 14} Whether a parent has voluntarily relinquished the right to custody is a factual question to be proven by a preponderance of the evidence. See *In re Perales* (1977), 52 Ohio St.2d 89, 6 O.O.3d 293, 369 N.E.2d 1047, syllabus; *Reynolds v. Goll* (1996), 75 Ohio St.3d 121,123, 661 N.E.2d 1008. Likewise, whether a parent, through words and conduct, has agreed to share legal custody with a nonparent is also a question of fact. A trial court has broad discretion in proceedings involving the care and custody of children. *Reynolds* at 124.

{¶ 15} We have consistently held that the determination of whether a "parent relinquishes rights to custody is a question of fact which, once determined, will be upheld on appeal if there is some reliable, credible evidence to support the finding." *Masitto*, 22 Ohio St.3d at 66, 22 OBR 81, 488 N.E.2d 857. See also *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 550 N.E.2d 178, syllabus ("Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court"). If similar findings are made by the trial and appellate courts, this court must accept those findings unless there is no evidence of probative value to support them. *Gillen-Crow Pharmacies, Inc. v. Mandzak* (1966), 5 Ohio St.2d 201, 205, 34 O.O.2d 417, 215 N.E.2d 377, citing *MacNab v. Bd. of Park Commrs. of Metro. Park Dist. in Cleveland* (1923), 108 Ohio St. 497, 500, 141 N.E. 332; *Peer v. Indus. Comm.* (1938), 134 Ohio St. 61, 67, 11 O.O. 454, 15 N.E.2d 772. Thus, this court will not disturb the trial court's findings unless those findings are unsupported by the evidence. *In re Estate of Duiguid* (1970), 24 Ohio St.2d 137, 141, 53 O.O.2d 328, 265 N.E.2d 287, quoting *Gates v. River Local School Dist. Bd. of Edn.* (1967), 11 Ohio St.2d 83, 40 O.O.2d 91, 228 N.E.2d 298, paragraph two of the syllabus.

6

*Review of trial court findings*

**{¶ 16}** In this case, the juvenile court engaged in an extensive analysis to determine whether Mullen's conduct created any agreement by which she had permanently ceded partial legal custody rights to Hobbs. The evidence the juvenile court cited to support Hobbs's allegations that Mullen agreed to permanently share custody with Hobbs included that (1) Hobbs and Mullen had planned for the pregnancy together, (2) Hobbs was present at the child's birth, (3) Hobbs's name appeared on the ceremonial birth certificate, (4) Hobbs and Mullen jointly cared for the child, (5) Hobbs and Mullen held themselves out as and acted like a family, (6) Mullen's will named Hobbs as the child's guardian, and (7) Mullen executed a general durable power of attorney and a health-care power of attorney giving Hobbs the ability to make school, health, and other decisions for the child.

**{¶ 17}** Thereafter, the court detailed the counterevidence. The court noted that all the documents created by Mullen that gave Hobbs some custodial responsibilities not only were revocable but were, in fact, revoked by Mullen. Testimony supported Mullen's statement that she did not intend to relinquish sole custody of the child in favor of shared custody with Hobbs. The juvenile court also stated that although the evidence was unclear whether a shared-custody agreement was actually drafted by the parties or presented to Mullen, the evidence did show that Mullen had consistently refused to enter into or sign any formal shared-custody agreement when presented with the opportunity to do so. In an apparent acknowledgment that the parties had presented conflicting evidence, the juvenile court commented that "under circumstances such as are present in this case a writing of the agreement between the petitioner and the mother would be instructive and preferred to determine whether a contractual relinquishment was made and how much custody was relinquished."

**{¶ 18}** The juvenile court also analyzed the role of the child's father when considering whether Mullen permanently gave over partial legal custody rights. Mullen and Liming each testified that they consider the donor agreement, executed prior the child's birth, no longer in effect, and they are not abiding by it. Like Hobbs, Liming has also had regular contact with the child, and he is a consistent presence in the child's life. He is listed on the child's official birth certificate and has formally acknowledged paternity. The juvenile court indicated that before Hobbs could be determined to have any shared-custody right, the father's pending parental rights must also be considered.

**{¶ 19}** On this conflicting and disputed evidence, the juvenile court concluded that there was reliable, credible evidence that Mullen's conduct did not create an agreement to permanently relinquish sole custody of her child in favor of shared custody with Hobbs. In accordance with its standard of review, the appellate court reviewed the evidence presented to the juvenile court and noted that there was strong evidence supporting both Mullen's and Hobbs's positions. However, of particular interest to the appellate court was the evidence that the juvenile court relied on to conclude that although Mullen and Hobbs had shared responsibilities for the child, Mullen had not agreed to permanently cede partial custody rights. The appellate court determined that "taken as a whole," reliable, credible evidence supported the juvenile court's findings that Mullen had not permanently given over partial legal custody of the child. *Mullen*, 185 Ohio App.3d 457, 2009-Ohio-6934, 924 N.E.2d 448, ¶ 16; *Masitto*, 22 Ohio St.3d at 66, 22 OBR 81, 488 N.E.2d 857. The appellate court declined to disturb that decision. *Mullen* at ¶ 17.

**{¶ 20}** We conclude that the appellate court applied the proper standard of review in this matter. We also conclude that the appellate court did not err when it affirmed the juvenile court's decision to dismiss Hobbs's complaint for shared custody of the child. Like that of the juvenile and appellate courts, our review of

the record shows that not only was there evidence indicating that Mullen had intended to share custody of the child, there was contrary evidence indicating that Mullen did not agree to permanently cede partial legal custody rights to Hobbs.

{¶ 21} In this regard, as the juvenile and appellate courts noted, we also observe that the best way to safeguard both a parent's and a nonparent's rights with respect to children is to agree in writing as to how custody is to be shared, the manner in which it is shared, and the degree to which it may be revocable or permanent, or to apply to a juvenile court for an order under R.C. 2151.23(A)(2) establishing the scope of the legal custody that the parent desires to share, or both. *Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 9. Our prior decisions have not required a parent to create a written contract to relinquish custody rights, although in some cases, writings may have been involved. *Masitto*, 22 Ohio St.3d at 64, 22 OBR 81, 488 N.E.2d 857; *Perales*, 52 Ohio St.2d at 90, 6 O.O.3d 293, 369 N.E.2d 1047.

{¶ 22} Finally, we do not agree with appellant's argument that "coparent" equals "shared legal custody" and that because the parties' statements and various documents used the term "coparent," the parties therefore clearly agreed to "shared legal custody." "Coparenting" is not synonymous with an agreement by the biological parent to permanently relinquish sole custody in favor of shared legal parenting. "Coparenting" can have many different meanings and can refer to many different arrangements and degrees of permanency. The parties' use of the term, together with other evidence, however, may indicate that the parties shared the same understanding of its meaning and may be considered by the trial court in weighing all the evidence.

### Conclusion

{¶ 23} Because the holdings of the juvenile and appellate courts are supported by the evidence and are not clearly against the manifest weight of the evidence, we must affirm them. *Gillen-Crow Pharmacies*, 5 Ohio St.2d at 205,

34 O.O.2d 417, 215 N.E.2d 377; *Peer*, 134 Ohio St. at 67, 11 O.O. 454, 15 N.E.2d 772. Accordingly, like the appellate court, we decline to disturb the juvenile court's decision. *Duiguid*, 24 Ohio St.2d at 141, 53 O.O.2d 328, 265 N.E.2d 287. We hold that competent, credible, and reliable evidence supports the juvenile court's conclusion that Mullen did not create an agreement to permanently relinquish sole legal custody of her child in favor of shared legal custody with Hobbs. Consequently, the juvenile court may not reach the questions of whether Hobbs is a suitable person to be a custodian of the child or whether shared legal custody is in the child's best interests. See *Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 48, 50.

{¶ 24} For the foregoing reasons, the appellate court did not err when it affirmed the juvenile court's decision to dismiss the complaint for shared custody. The judgment of the court of appeals is affirmed.

Judgment affirmed.

LUNDBERG STRATTON, O'DONNELL, and LANZINGER, JJ., concur.

O'CONNOR, C.J., and PFEIFER and MCGEE BROWN, JJ., dissent.

_____

**O'CONNOR, C.J., dissenting.**

{¶ 25} Because the law governing this case is well settled and the majority establishes no new law or governing principle, I would dismiss this appeal as having been improvidently accepted.

{¶ 26} It is irrefutable that parents have fundamental constitutional rights free from government intervention in their decisions on the custody and caretaking of their children. *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 16. It is also irrefutable that those rights are not absolute.

{¶ 27} A parent may contractually relinquish custody rights and fully or partially confer those rights on another person who is not a parent to the child. *Masitto v. Masitto* (1986), 22 Ohio St.3d 63, 66, 22 OBR 81, 488 N.E.2d 857; *In*

*re Perales* (1977), 52 Ohio St.2d 89, 98, 6 O.O.3d 293, 369 N.E.2d 1047. Thus, although Ohio law will not recognize a biological parent's intent to confer the status of "parent" on a same-sex partner, it will recognize a biological parent's decision to voluntarily relinquish the right to sole custody of the children in favor of sharing custodial rights with that partner. *In re Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 47.

{¶ 28} For courts to enforce a parent's decision to confer custody rights of a minor child on a same-sex partner or other person who is not within the legislative definition of a "parent" to the child, there must be a showing that the parent contractually agreed to share custody. *Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 48; *Perales*, 52 Ohio St.2d at 98, 6 O.O.3d 293, 369 N.E.2d 1047. The juvenile court's decision will be upheld if there is some reliable, credible evidence to support that finding of an intention to share with another person the custody of a child. *Masitto*, 22 Ohio St.3d at 65, 22 OBR 81, 488 N.E.2d 857. Arguably, that evidence can take many forms, including the conduct of the parties before and after the child's birth.

{¶ 29} Nothing in *Bonfield* or our prior decisions mandated that an agreement to relinquish sole custody be in writing. But as the facts of this case show, prudence now dictates that the agreement be documented.

{¶ 30} The American family takes many forms, including those in which children are raised lovingly in homes headed by two fathers or two mothers, or by grandparents and siblings, or by a single parent. Our evolving social and cultural notions of family and parenthood coincide with the advancement of reproductive science, medicine, and technology that now permits people to create families in ways quite different from the traditional paradigm in which children are born of one woman impregnated directly by one man. As our understandings of the family evolve, so do our understandings of parenthood. "Parenthood in our complex society comprises much more than biological ties, and litigants

increasingly are asking courts to address issues that involve delicate balances between traditional expectations and current realities." *N.A.H. v. S.L.S.* (Colo.2000), 9 P.3d 354, 359. This is such a case.

{¶ 31} But the public policy inherent in the discussion of children in these families, including same-sex couples, is largely undefined in Ohio. The current statutory definition of "parent" is often unhelpful in custody determinations in families headed by same-sex couples.

{¶ 32} To the degree that guidelines exist, they have been established, with some trepidation, by the courts. Thus, in *Bonfield*, this court declined to adopt the "psychological" or "second parent" tests described in *V.C. v. M.J.B.* (2000), 163 N.J. 200, 233, 748 A.2d 539, and *In re Custody of H.S.H.-K.* (1995), 193 Wis.2d 649, 658, 533 N.W.2d 419, because it is not the province of the judiciary to expand a statutory definition created by the General Assembly. Accord *Smith v. Gordon* (Del.2009), 968 A.2d 1, 14-15. Instead, we attempted to apply the extant legal standards to a same-sex couple and their children. In doing so, we were driven not by "judicial activism" but by the reality that children exist in an array of familial configurations and that decisions about the custody and care of those children must be made, even in the void of legislative guidance.

{¶ 33} *Bonfield* was announced almost ten years ago. Little legislative action has followed in its wake. Although *Bonfield* has proven to provide guidance when the parent appears in court with a nonparent and expresses a clear desire to share custody of the child with the nonparent, it is of limited value in cases like this one, in which the parties now dispute that shared custody was ever intended or granted. The well-being of the child while the custody dispute is litigated is of paramount concern not only to the child and her family, but also to the juvenile courts that must continue to struggle to apply existing statutory definitions of a "parent" to custody determinations in same-sex couples and other families. The stakes are too high to permit so much uncertainty.

**{¶ 34}** In the absence of a statutory framework, the sufficiency of the evidence to show voluntary relinquishment of a parent's custodial rights is even more critical. Although not required, a written agreement will demonstrate the best evidence of the parent's intention to share custody, particularly in cases, like this one, in which the evidence stands in near equipoise. It is the preferred method of demonstrating the knowing and intelligent surrender of the parent's fundamental right, in whole or in part, and reinforces to both the parent and the proposed custodian the concomitant rights and responsibilities that are associated with custody of a child.

**{¶ 35}** When any parent, without benefit of marriage, voluntarily brings another adult into the life of his or her child with the intent to create shared custody, the parent must proceed not only with the desire to create the custodial relationship, but also with diligence required to protect the child. The duty to protect a child and prepare for the child's care, both at present and in the future, is a solemn one that flows to all parents in all families. Under certain circumstances it also flows to the courts. As we held in *Bonfield*, and reiterate now, pursuant to R.C. 2151.23(A)(2), the juvenile courts have the jurisdiction and duty to determine custody claims of children who are not wards of a court. *Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, at ¶ 45, 50; *Morris v. Hawk*, 180 Ohio App.3d 837, 2009-Ohio-656, 907 N.E.2d 763, ¶ 22.

MCGEE BROWN, J., concurs in the foregoing opinion.

_____

**PFEIFER, J., dissenting.**

**{¶ 36}** Is filial love something to be dangled and then snatched away, promised and then reneged upon? Once a natural parent promises a coparenting relationship with another person and acts on that promise, she has created a relationship between the coparent and the child that has its own life. The natural parent cannot simply declare that relationship over. That is what Kelly Mullen

attempts to do in this case and what the majority decision allows. Now, no court will ever determine whether it is in Lucy Mullen's best interests to have a continuing relationship with the woman she calls "Momma," Michele Hobbs. Because the juvenile court in this case at the very least should have gotten to the point of making that best-interests determination, I dissent.

**{¶ 37}** The majority decision makes important points. It reinforces the holding from *In re Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 48-50, that an agreement to share custody is an enforceable agreement subject only to a court's review of the best interests of the child. The majority opinion also establishes that an agreement to share custody need not be written—a natural parent's words and conduct may demonstrate an intent to share legal custody with someone who is not a biological parent—and that if a natural parent has agreed to share custody, then a court must examine what type of custody and visitation arrangement is in the best interest of the child. Thus, promises made between adults do not legally affect a child unless a judge decides that a parent's sharing custody with a nonparent is in the child's best interests.

**{¶ 38}** However, the majority rests its decision on a determination that there was reliable, credible evidence supporting the trial court's decision that Mullen did not relinquish partial custody to Hobbs. In my view, the trial court gave improper weight to a document that did not exist and improperly ignored the documents that did exist.

**{¶ 39}** The factor cited by the trial court as the most crucial to its decision is Mullen's alleged refusal to enter into a *Bonfield*-type written agreement with Hobbs regarding custody. This allegation was relied upon in error. By Mullen's own testimony, the issue was not even raised between the two until Lucy was eight months old. Hobbs placed the discussion months later. Whichever is the case, Mullen had made clear long before any discussion about a *Bonfield*-like agreement that she considered Hobbs a coparent.

{¶ 40} In 2004, the women together began the in vitro fertilization process, jointly executing a consent and agreement for cryopreservation and disposition of frozen embryos and informed consent for in vitro fertilization. Mullen signed as the female participant, and Hobbs signed as her partner. In the informed-consent document, Mullen specifically acknowledged her partner, Hobbs, as a legal parent of any children born of the insemination process. Such a statement was not necessary to allow Mullen to proceed with the in vitro procedure but is further illustration that the women understood and agreed that Hobbs would have a custodial role once the child was born. In addition, the women shared the financial responsibility of the process.

{¶ 41} Mullen became pregnant, and with Hobbs at her side, delivered a baby on July 27, 2005. The hospital created a ceremonial birth certificate that named the couple as the baby's parents.

{¶ 42} Thus, the facts show that a coparenting relationship was established long before any talk of a *Bonfield*-type agreement arose. The lack of a *Bonfield* agreement does not negate the fact that an agreement to share custody already existed before Lucy was even born. A *Bonfield* agreement was not necessary.

{¶ 43} The trial court also erred in concentrating on the revocability of the three documents Mullen signed that proclaimed that she considered Hobbs a "co-parent in every way." Before the baby's birth, Mullen, through counsel, executed a will, a health-care power of attorney, and a general durable power of attorney for her child, in which she designated Hobbs the guardian of her minor child with authority to act as Mullen's agent to make decisions regarding the child. The power of attorney was nonspringing: it took effect immediately and did not require Mullen's incapacitation for Hobbs to be able to make decisions for Lucy. The document included the statement "I give my said Agent every Power with respect to my child that I possess."

**{¶ 44}** In each of the three documents, Mullen signed her name acknowledging the following statement: "I consider Michele Hobbs as my child's co-parent in every way." That statement was not a necessary part of the legal documents. Mullen's lawyer testified, "[M]y purpose in — in including that is that I want to—without the benefit of marriage or other protections or—I—I want to protect the rights of the co-parent to be a full co-parent. I want—I always want to make that abundantly clear in the documents." Mullen's statement was a way to show the world that Mullen and Hobbs intended to raise Lucy together, equally. Can an agreement that another person is a coparent in every way possibly not include a right to custody?

**{¶ 45}** It cannot. The trial court seems to agree, and thus turns its emphasis to the fact that the documents were revocable. But the question before the court was whether Mullen agreed to share custody of her child with Hobbs, not whether she eventually came to regret that decision. Whether the documents were revocable is a red herring. The true question is when they were revoked. Executed before Lucy was born, they were not revoked when Lucy was born, when she was one year old, or even when the couple sought counseling because of difficulties in the relationship. Not until the pair separated after Lucy's second birthday did Mullen revoke the statement "I consider Michele Hobbs as my child's co-parent in every way." Any reliance on what Mullen did after she separated from Hobbs was error.

**{¶ 46}** I would conclude that the trial court's judgment is not based upon competent, reliable evidence. Instead of being based upon the facts of what actually happened during Mullen and Hobbs's relationship and their parenting of Lucy, the decision was based almost entirely on how Mullen felt *after* the termination of her relationship with Hobbs.

**{¶ 47}** This case is about a natural parent's changing her mind, and the majority's supposed "safeguard" for future cases does not sufficiently address

such a prospect and completely muddies the waters regarding what steps a couple should take to establish joint custody. The majority suggests that a would-be coparent and natural parent "agree in writing as to how custody is to be shared, the manner in which it is shared, and the degree to which it may be revocable or permanent."

{¶ 48} Couples will justifiably wonder what the majority means when it describes a writing that sets forth "how custody is to be shared [and] the manner in which it is shared." Is it not enough to say that the natural parent is ceding partial custody to the nonparent so that the two can raise the child together equally? Is the couple to describe in a legal document how they expect the family dynamic to develop? Can they not let the circuitous path of family life determine how they together raise the child? Must they define roles? Must they establish a visitation schedule to use after an eventual break-up, before a baby is even brought home from the hospital?

{¶ 49} The majority also mentions that the couple should establish the degree of revocability or permanence of shared custody in an agreement. But the majority has already established that any agreement that is revocable is worthless to a nonparent, even if it has not been revoked.

{¶ 50} The majority's other suggestion, that a couple "apply to a juvenile court for an order under R.C. 2151.23(A)(2) establishing the scope of the legal custody that the parent desires to share," is like rolling the dice. The nonparent's future relationship with the child depends on whether the juvenile judge decides to bless the relationship. If the judge does not, then the nonparent is left with nothing.

{¶ 51} This case presents an opportunity for this court to present a more workable analysis for lower courts to employ in cases of disputed custody between a natural parent and a nonparent, an analysis rooted in the intent of the parties as evidenced by the nature of the familial relationship. In this and future

cases, we should adapt the four-part test set forth in *In re Custody of H.S.H.-K.* (1995), 193 Wis.2d 649, 658, 533 N.W.2d 419, to aid trial courts in determining whether a biological parent has ceded custody to another.

{¶ 52} In *Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 31, this court considered whether to adopt the test that the Wisconsin Supreme Court enunciated in *H.S.H.-K.* to determine whether someone who is not a biological or adoptive parent can be accorded "psychological parent" or "second parent" status. Under the *H.S.H.-K.* test, a petitioner seeking visitation rights must prove four elements: "(1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature." *H.S.H.-K.*, 193 Wis.2d at 658, 533 N.W.2d 419.

{¶ 53} This court ultimately decided not to adopt that test in *Bonfield*, finding it "inappropriate to adopt [the] four-part test to broaden the narrow class of persons who are statutorily defined as parents for purposes of entering a shared parenting agreement." *Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 34. But *Bonfield* was not a disputed custody case; the parties had alleged that they were coparents and sought a court's imprimatur of that status by using the *H.S.H.-K.* factors to confer parenthood on the nonbiological would-be parent so that the couple could enter into a shared-parenting agreement pursuant to R.C. 3109.04. This court held that the natural parent and her partner could simply submit their agreement to the juvenile court for a "best interest of the child"

determination, without parental status being accorded the natural parent's partner. *Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 50.

{¶ 54} Here, however, there is a dispute. Hobbs wants the custody that she believes Mullen ceded to her. The juvenile court must determine whether Mullen did indeed cede custody. Though admittedly not designed for the particular purpose of determining whether custody has been ceded, adapting the *H.S.H.-K.* test to custody cases would present a structured way to determine whether there was a meeting of the minds on an agreement to share custody and whether the agreement was acted upon. The test determines whether a parent-like relationship developed between the nonparent and the child. It requires more than a simple promise or aspiration regarding custody and limits the possibility of a nonparent's reliance upon a misconstrued sentiment in establishing a custodial relationship with the child.

{¶ 55} For instance, the first element requires consent to and cultivation of a parent-like relationship between the adult and the child by the natural parent. Words and actions are necessary to prove the first element. *H.S.H.-K.*, 193 Wis.2d at 658, 533 N.W.2d 419. In this case, not only did Hobbs and Mullen discuss having a child together, but the couple entered the in vitro process together and paid for it together and listed both their names as parents on a hospital-generated birth certificate; Mullen signed three legal documents that referred to Hobbs as a "co-parent in every way" and encouraged Lucy to call Hobbs "Momma."

{¶ 56} The second element – that the petitioner and child live together – again requires evidence of an intent to create a family-like environment for the child. Id. Here, for the first two years of Lucy's life, Mullen, Hobbs, and Lucy resided in the home that the women owned together.

{¶ 57} The third element further ensures that the relationship be parental in nature by requiring that the petitioner take significant responsibility for the child's care, education, and development. Id. Hobbs cooked for Lucy, cared for

her when she was ill, and adjusted her own work schedule to transport Lucy to and from daycare. Though Mullen carried more of the childrearing role than Hobbs, Hobbs shared significant responsibility for Lucy.

{¶ 58} Finally, the fourth element requires that the relationship be significant in duration and depth. Id. It is not enough that the child and adult have bonded; the child must be bonded to the adult in a relationship that is "parental in nature." Id. At the time Hobbs filed her complaint to gain partial custody of Lucy, she had been living with Lucy and caring for her for almost all of Lucy's life.

{¶ 59} Adapting the *H.S.H.-K.* test to determine whether custody has been ceded to a nonparent from a parent would establish important benchmarks for biological parents and partners and would create less of a "know it when we see it" rubric for trial judges in addressing custody matters. It would ensure that a nonparent cannot gain custody of a child without first having a significant, parent-like relationship with that child that the natural parent allowed and encouraged. Finally, a natural parent's decision to end her relationship with a coparent would not obviate the reality of a child's relationship with a coparent.

{¶ 60} I would hold that Hobbs fulfills all the *H.S.H.-K.* elements and that this case should be remanded to the juvenile court to determine whether shared custody would be in the best interests of the child. The majority's decision today is the last step in this saga, and sadly, the best interests of Lucy will never have been considered at any level. Instead, Mullen's self-interest will be the sole determining factor.

{¶ 61} Besides Hobbs and Lucy, common decency is another victim in this case. Mullen was able to use the law as a weapon because same-sex coparents lack legal rights. The law has not caught up to our culture, and this court has failed to craft a rule that addresses reality. Mullen and Hobbs employed a well-versed lawyer who represents people in their situation, and with his advice

20

did all they could do to protect Hobbs. A maternal relationship existed between Hobbs and Lucy. Mullen taught her daughter to call another woman "Momma" and to love her as a mother. She now wishes she hadn't, and for the majority, that's enough. It shouldn't be.

_____

Newman & Meeks Co., L.P.A., and Lisa T. Meeks; and Lambda Legal Defense and Education Fund, Inc., and Christopher R. Clark, for appellant.

Dougherty, Hanneman & Snedaker, L.L.C., and Douglas B. Dougherty, for appellee Kelly Mullen.

Terry W. Tranter, for appellee Scott Liming.

Sallee M. Fry, urging reversal for amicus curiae National Center for Lesbian Rights.

Matthew J. Burkhart and Austin R. Nimocks, urging affirmance for amicus curiae Alliance Defense Fund.

Horatio G. Mihet, Rena M. Lindevaldsen, and Mathew D. Staver, urging affirmance for amicus curiae Liberty Counsel.

American Civil Liberties Union of Ohio Foundation, Inc., Carrie L. Davis, and James L. Hardiman; and American Civil Liberties Union Foundation Lesbian, Gay, Bisexual, Transgender and AIDS Project and John A. Knight, for amici curiae American Civil Liberties Union of Ohio and American Civil Liberties Union.

Porter, Wright, Morris & Arthur, L.L.P., Kathleen M. Trafford, and Daniel B. Miller, for amici curiae National Association of Social Workers and National Association of Social Workers, Ohio Chapter.

_____